**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| **In re:** | : **Chapter 11** |
|  | : |
| **GVO PARTNERS LLC,** *et al.*,[1] | : **Case No. 26-10976 (KBO)** |
|  | : |
| **Debtors.** | : **(Jointly Administered)[2]** |
|  | : |
|  | : **Hearing Date: July 27, 2026, at 1:00 p.m.** |
|  | **(requested)** |
|  | **Objection Deadline: July 24, 2026 (requested)** |
|  | **Hearing Place: 6th Floor, Courtroom #3** |

### FIRSTRUST BANK'S MOTION TO APPOINT CHAPTER 11 TRUSTEE

Firstrust Bank ("Firstrust") hereby submits this motion (the "Motion") to appoint a chapter 11 trustee (the "Chapter 11 Trustee") in the above-captioned jointly administered case (the "Chapter 11 Cases") of debtors GVO Partners LLC et al. (the "Debtors"). In support of this Motion, Firstrust respectfully states as follows:

### PRELIMINARY STATEMENT

1. The appointment of a Chapter 11 Trustee is necessary in these jointly administered but not consolidated Chapter 11 Cases due to the gross mismanagement of the Debtors' business by current management, its refusal to meet with interested purchasers, and intentions, expressed in Debtors' Recent Motion to Convert to Chapter 7 (D.I. 59) (the "Motion to Convert"), to close the businesses, to the great detriment of all creditors.

2. Firstrust avers that there are a number of persons who have expressed interest in the Debtors' business but the Debtors are at this juncture unwilling to meet with the potential

---

[1] The Debtors in these Cases, along with the last four (4) digits of their federal tax identification numbers, are: GVO Partners LLC (5862); GVO Holdings Group LLC (8330), GVO Topco LLC (5638); GVO Urban, LLC (8860); GVO Still Waters, LLC (5823); GVO Sweetgrass, LLC (7775); and Urban Medspa & Weight Loss Center Charlotte, P.C. (7185). The Debtors' mailing address is 218 Brighton Park Blvd., Suite 101, Summerville, SC 29486.

[2] On June 23, 2026, the Court entered an order directing the joint administration of the Debtors' bankruptcy cases. (D.I. #18).

purchasers.   The existing value can be retained and realized only through the immediate appointment of a Chapter 11 Trustee, rather than conversion to a Chapter 7 case as the Debtors request in the Motion to Convert.

3.      Firstrust brings this instant Motion because the facts and law compel the appointment of a Chapter 11 Trustee that can protect not only Firstrust's secured claim against the Debtors created through a series of loans (the "Loans") issued by Firstrust to the Debtors in 2023 and 2024, but also protect interests of all other stakeholders, both secured and unsecured.   Should this case be converted to a Chapter 7 proceeding, neither Firstrust's nor the other interested creditors and parties have any reasonable expectation of any form of recovery.

4.      Appointment of a Chapter 11 Trustee is particularly suitable here because the Debtors  have actual value as a going concern, but have found themselves in this situation purely through the acts and malfeasance of the Debtors' controlling manager, Joseph Sciamanna ("Sciamanna").  Firstrust agrees that Sciamanna should be removed from control, but believes that an independent fiduciary could engage potential purchasers to maximize value of the Debtors' assets.

5.      Here, there is every independent legal basis to appoint a Chapter 11 Trustee under U.S.C. § 1104(a) to protect the Debtors' estate from continuing mismanagement and misuse by Sciamanna, who has been credibly accused of at least the following: (i) using co-workers' credentials to fraudulently write improper prescriptions, and firing the same victim co-workers upon their discovery of the scam; (ii) operating the Debtors' business without proper licenses; (iii) misrepresenting his ability to run the Debtors' medical practice; (iv) wrongfully terminating additional key employees while creating a toxic work environment; and (v) breaching the Loans

4931-1941-7022 v1

by taking on additional secured debt through seven usurious and potentially fraudulent merchant cash advance loans (the "MCA Loans") without Firstrust's prior knowledge or consent.

6.      The above allegations and complaints are derived from the non-Sciamanna owners and current and former employees of the Debtors, indicating that the Debtors' business is comprised of other ethical and serious business minded individuals who are committed to the Debtors' success as a going concern, but are being stymied by the poor decisions of Sciamanna. Recovery to creditors is only achievable by the appointment of an independent, competent, fiduciary, a Chapter 11 Trustee.

7.      Accordingly, grounds exist under 11 U.S.C. §§ 1104(a)(1) and (2) for the appointment of a Chapter 11 Trustee in these Chapter 11 Cases. The appointment of a Chapter 11 Trustee is in the best interests of the estates to ensure that control of the Debtors is vested in a completely independent party – not the reckless and control being exercised by Sciamanna.

8.      Further, conversion of this case to Chapter 7 ensures that the Debtors' business fails and creditors, including Firstrust and all secured and unsecured creditors, receive nothing.

9.      It is with this backdrop that Firstrust files this Motion. To be clear, Firstrust does not want the Debtors' operations to shut down. Rather, Firstrust cannot stand by and let the Debtors' value and brand be squandered and tarnished under the Debtors' current leadership – ultimately diminishing the collateral to the point where even under a Chapter 7 case Firstrust and other creditors are likely to receive little to nothing. As set forth above, and as more fully set forth below, it is indisputable that Sciamanna's control of the Debtors' has been detrimental to the long-term viability of the Debtors' business and his decision to give up management and end operations is an opportunity for recovery, not a negative, provided that an independent trustee is immediately appointed to continue operations and negotiate for a sale with the interested parties.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157, and the *Amended Standard Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012 (the "Standing Order").  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.

11.     Venue is  proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

12.     The statutory predicates for the relief sought in this Motion are found in section 1104 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), Rules 2007.1 and 9014 of the Federal Rules of  Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9013 of the Local Rules for the United States Bankruptcy Court District of Delaware (the "Local Rules").

13.     Firstrust confirms it consents pursuant to Rule 9013-1(f) of the Local Rules to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article II of the United States Constitution

## REQUESTED RELIEF

14.     By this Motion, Firstrust respectfully requests that the Court enter an order, in substantially the form filed contemporaneously herewith, (a) granting the Motion; (b) directing the Office of the United States Trustee (the "UST") to appoint one disinterested person as Chapter 11 Trustee in these Chapter 11 Cases under and pursuant to Bankruptcy Code Section 1104(a); (c) ordering the UST to seek approval of such appointment from this Court in accordance with Bankruptcy Code Section 1104(d) and Bankruptcy Rule 2007.1(c); and (d) order the Debtors and

4

any other individual or entity in possession of the Debtors' records and property to cooperate with the Chapter 11 Trustee and immediately turn over to the Chapter 11 Trustee all records and property of the estate in their possession or control as directed by the Chapter 11 Trustee.

## BACKGROUND

15.     On or about June 16, 2026 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtors filed a motion requesting  joint administration of their Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b), (D.I. #3), which was granted on June 23, 2026.

16.     Firstrust is a secured creditor of the Debtors, who, in 2023 and 2024, extended three (3) loans to debtor, GVO Holdings Group LLC ("GVO Holdings"), in the aggregate amount of $10,850,000, and holds a first priority fully perfected security in all of the Debtors' assets.

17.     GVO Holdings manages the business affairs of its co-debtors affiliates, GVO Urban, LLC ("GVO Urban"), GVO Still Waters, LLC ("GVO Still Waters"), and GVO Sweetgrass LLC ("GVO Sweetgrass").

18.     These entities are engaged in the business of operating medical spas/weight loss centers in Florida, North Carolina, and South Carolina.

19.     The Debtors are all ultimately controlled by Joseph Sciamanna ("Sciamanna") as the controlling manager of each of the Debtors.

### A.  The Loans and Defaults Thereon

20.     On June 20, 2023, Firstrust extended a loan to GVO Holdings in the amount of $1,900,000.00 (the "Urban Loan").  A copy of the applicable loan agreement is attached as Exhibit "A" hereto.

21.     The Urban Loan was guaranteed by, among other parties (including Sciamanna),

5

4931-1941-7022 v1

GVO Urban, GVO Partners, and GVO Topco.

22.     On August 23, 2023, Firstrust extended a loan to GVO Holdings in the amount of $4,850,000.00 (the "Sweetgrass Loan"). A copy of the applicable loan agreement is attached as Exhibit "B" hereto.

23.     The Sweetgrass Loan was guaranteed by, among other parties (including Sciamanna), GVO Urban, GVO Partners, GVO Topco, and GVO Sweetgrass.

24.     On March 29, 2024, Firstrust extended a loan to GVO Holdings in the amount of $4,100,000.00 (the "Still Waters Loan").  A copy of the applicable loan agreement is attached as Exhibit "C" hereto.

25.     The Still Waters Loan was guaranteed by, among other parties (including Sciamanna), GVO Urban, GVO Partners, GVO Topco, GVO Still Waters, and GVO Sweetgrass.

26.     Each of the loans required the Debtors to warrant that the Debtors and their businesses were and would remain "in compliance in all material respects with all applicable statutes, and material ordinances and governmental rules." See Exhibits "A, B, and C" §§ 6.1.2, 6.2.

27.     Each of the loans also required the Debtors to "[c]omply in all material respects with all applicable Laws of all Governmental Authorities acting in or for the locality" where the Debtors' business operated.  *See* Exhibits "A, B, and C", § 7.5.

28.     Each of the loans also required the Debtors to obtain and maintain all permits and approvals related to their business operations, and to "comply with all requirements of Governmental Authorities related thereto."  *See* Exhibits "A, B, and C" § 7.16.

29.     As a remedy for any default, and in connection with each loan, the Debtors provided conditional resignation documents that gave Firstrust the ability to obtain control of their boards

6

of managers via the resignation of managers and/or the suspension of their management rights. *See, e.g.*, Conditional Resignation for GVO Partners in connection with the Still Waters Loan, attached as Exhibit "D" hereto; Amended LLC Agreement of GVO Partners, attached as Exhibit "E" hereto.

30.     Essentially, Firstrust was provided with the ability to take over management of the Debtors' businesses.

31.     On November 6, 2025, Firstrust sent GVO Holdings notices of default under each of Firstrust's three (3) loans. Copies of these notices are attached together as Exhibit "F" hereto.

32.     The notices detailed instances of default of which Firstrust was aware at that time, including (a) GVO Holding obtaining additional financing secured by the properties that secured Firstrust's loans without Firstrust's knowledge or consent, (b) GVO Holding's failure to maintain the requisite deposit and operating accounts with Firstrust, (c) GVO Holdings' failure to maintain the requisite funded debt to adjusted EBITDA ratio, (d) GVO Holdings' failure to maintain the requisite fixed charge coverage ratio, and (e) the continued existence of a lawsuit brought by former employee alleging improper termination and deprivation of his equity rights in one of the businesses.  *See* Exhibit "F" hereto.

33.     GVO Holdings remains in default for all of these reasons, and the other Debtors are likewise in default of their obligations as guarantors.

**B.  The Debtors' Misconduct**

34.     Firstrust has been made aware of numerous instances of gross misconduct and fraudulent activity raised by a number of individuals who are intimately aware of the Debtors' business practices:

a.  On January 29, 2026, Jawad Salim and Katherine Salim, filed a seven (7) count

7

civil complaint in North Carolina (the "Salim Complaint") alleging that, among other things, Sciamanna was using their credentials to fraudulently write prescriptions and was improperly prescribing medication, and that the discovery of this led to their termination (see Exhibit "G" which is incorporated by reference). For example, the Salim Complaint avers that on or about August 8, 2025, Sciamanna "fraudulently used Ms. Salim's national provider identifier ("NPI"), forging four electronic prescriptions for himself without Ms. Salim's authorization…" *Id.* at ¶28;

b.  In a lawsuit filed by Dennis Schimpf in South Carolina (the "Schimpf Lawsuit"), he alleged that Sciamanna and GVO Holdings began "improperly influencing and grossly mismanaging" the business operations of GVO Sweetgrass, and have improperly taken control over that practice even though they are not licensed to own or manage it (*see* Motion for TRO and Preliminary Injunction in the Schimpf Action, attached as Exhibit "H" hereto);

c.  Firstrust received direct correspondence from Salim, Schimpf, and other co-owners of the medical practices acquired by GVO Holdings in which they raise allegations of, among other things, (i) minority ownership oppression, (ii) wrongful termination of employees, (iii) creation of a hostile work environment, (iv) suspicious financial activity, (v) complete lack of fiduciary oversight, and (vi) the fact that Sciamanna and GVO Holdings misrepresented their ability to run the various medical practices in question when, in fact, that had no relevant experience or ability to do so (*see* letter from co-owners, attached as Exhibit "I" hereto).

d.  Firstrust received copies of correspondence from Mitchell Raab, attorney for Art

8

Baer, to Robert McCann, attorney for the Debtors, alleging that Mr. Baer was fired in retaliation for: (i) his belief that the financials provided to GVO's lender regarding a potential acquisition were not correct and that Firstrust should have been provided with updated financial statements, and (ii) his belief that James Zho, a manager of GVO Partners, should review his status as a foreign person and role as required under GVO's loan agreements with Firstrust. The correspondence from Attorney Raab further notes that mere hours before Mr. Baer's termination, Mr. Baer raised certain issues to the Debtors including (1) Mr. Baer's belief that Firstrust should have been notified that, although the matter was dismissed in legal process, Mr. Sciamanna was charged with a criminal felony during 2024 and that a felony arrest warrant had previously been issued for Mr. Sciamanna while the Firstrust's loans to GVO Holdings were outstanding and during a time period where Defendants were seeking additional credit and covenant waivers from Firstrust and (2) Mr. Baer's belief that the Debtors should notify Firstrust that there was ongoing litigation involving a counterclaim against a GVO subsidiary (Micropigmentation Partners) that Mr. Baer believed may not have been disclosed to, and was being obfuscated from Firstrust (*see* e-mail from Attorney Raab, attached as Exhibit "J" hereto);

e. Firstrust received direct correspondence from Matthew Melville, counsel for Jordan Bloom and Matthew Sussman, to Cheryl Lagey, counsel for the Debtors, alleging GVO Partners failed to, among other things: (i) schedule or convene a requested board meeting, (ii) provide any financial information requested by Mr. Bloom and Mr. Sussman to them, and (iii) provide accurate and complete financial

9

information, as evidenced by the undisclosed covenant breaches in the quarters ending March 31, 2025 and June 30, 2025. The letter further alleges that Mr. Sciamanna (1) breached fiduciary duties by refusing to provide GVO Partners' board of managers with material information regarding the Company's financial condition and the defaults under the loans from Firstrust, (2) violated Section 18-305 of the Delaware Limited Liability Company Act, which requires the managers be provided with information regarding the affairs of the company as is just and reasonable, (3) breached Article XI of GVO Partners' operating agreement by failing to provide information to Mr. Bloom and Mr. Sussman, and (4) obstructed board governance by refusing to convene a board meeting to address the defaults under the loans from Firstrust and GVO Partners' financial crisis, and by potentially concealing material adverse financial information including covenant breaches, preventing GVO Partners' board of managers from discharging their fiduciary duties (*see* letter from Attorney Melville, attached as Exhibit "K" hereto).

f. Firstrust received notice that the Debtors began to default under their property leases, where the Debtors operate.

g. The Debtors, between March 31, 2026, and May 27, 2026, took out seven (7) separate Merchant Cash Advance loans totaling more than $719,000.00 (the "MCA Loans").

h. Upon information and belief, the MCA Loans are usurious and in violation of applicable state laws prohibiting interest rates assessed by the MCA Loans.

i. Firstrust received notice that the Debtors were insolvent.

35. Firstrust worked diligently to try to conduct its own analysis of these allegations,

10

4931-1941-7022 v1

but was stonewalled at every turn by the Debtors, who refused to turn over any information that would aid Firstrust in its efforts.

### C.  <u>The Receiver Complaint</u>

36.     All of the above, taken together, led Firstrust to believe that urgent, drastic action is required to protect the Debtors' businesses and Firstrust's interests in them.

37.     As such, on or about May 7, 2026, Firstrust initiated an action in the Court of Chancery for the State of Delaware, seeking both the immediate appointment of a receiver pendente lite and the permanent appointment of a receiver to manage the affairs of all of the Debtors in order to protect its rights (C.A. No. 2026-0315 LWW) (the "Receiver Complaint"). A true and correct copy of the Receiver Complaint is attached as Exhibit "L" hereto.

38.     The Receiver Complaint alleged that Firstrust, as well as any other creditors of the Debtors, would be irreparably harmed if the mismanagement of the Debtors continues, as the security provided for their loans would be permanently lost when the businesses fail.

39.     Specifically, the Receiver Complaint noted that Sciamanna's conduct made it exceedingly likely that the Debtors' businesses would fail imminently unless immediate action is taken.

40.     The Receiver Complaint sought the appointment of a receiver as there was an imminent risk of great loss unless a receiver is appointed, including but not limited to:

    a.  One or more of the Debtors potentially being subject to significant civil liability;

    b.  Significant risk to the ongoing functionality and profitability of each of the Debtors' businesses by mismanagement, including but not limited to, terminating key employees; and

    c.  Insolvency.

11

41.     In addition, the Receiver Complaint details how the Debtors have breached each of the three Loans, along with their respective guaranties, which has resulted in damages to Firstrust. Ex. L ¶¶ 31-37.

42.     In further breach of the Loans and his fiduciary duties owed to the Debtors, Sciamanna obtained seven merchant cash advance loans (the "MCA Loans") at extremely high interest rates that effectively drained funds from the Debtors' estates.  Ex. G.

## ARGUMENT

### A.  The Court Must Appoint a Trustee Upon Finding of Cause or Where It Is in the Interest of Creditors and Other Interests of the Estate

43.     Section 1104(a) of the Bankruptcy Code provides that the Bankruptcy Court shall order the appointment of a trustee, at any time after the commencement of the case but prior to confirmation of a plan, on request of a party in interest or the U.S. Trustee, and after notice and a hearing:

> (1) for cause, including fraud, dishonesty, incompetence or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

> (2) if such appointment is in the interests of creditors, any equity security holders and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a)(1) and (2).

44.     Subsection (a)(1) addresses management's pre- and post-petition misdeeds or mismanagement, i.e., for cause, while subsection (a)(2) provides the court with "particularly wide discretion" to appoint a trustee even absent wrongdoing or mismanagement when the appointment is in the interest of creditors. *In re Bellevue Place Assocs.*, 171 B.R. 615, 623 (Bankr. N.D. Ill.

12

1994); *see also*, *Official Comm. Of Asbestos Pers. Injury Claimants v. Sealed Air Corp. (In re W.R. Grace & Co.)*, 285 B.R. 148, 158 (Bankr. D. Del. 2002) (similar).

45.     "The circumstances that qualify as cause under subsection (a)(1) are not limited to the examples listed in the statute, such as fraud, dishonesty, etc." *In re Marvel Entm't Group, Inc.*, 1997 U.S. Dist. LEXIS 24241 at * 16 (D. Del. 1997).

46.     Where the court finds either that cause exists or that appointment is in the interest of the parties, an order for the appointment of a trustee is mandatory. *Sealed Air Corp.*, 285 B.R. at 158.

47.     Debtors and their officer Sciamanna have a fiduciary duty to creditors, including Firstrust, which creates an "obligation to treat all parties, not merely the shareholders, fairly." *In re The AdBrite Corporation*, 290 B.R. 209, 217 (Bankr. S.D.N.Y. 2004) (citations omitted).

48.     The presumption that a debtor should remain in possession of its estate and in control of its affairs holds only if management "can be depended upon to carry out the fiduciary responsibilities of a trustee." *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985).

49.     Here, the Debtors' and their manager, Sciamanna's, fiduciary duties are extended to their creditors, particularly Firstrust as the Debtors' largest – to Firstrust's knowledge – secured creditor with primacy rights under the Loans. *See In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 169 (Bankr. S.D.N.Y. 1990) ("a debtor-in-possession must act as a 'fiduciary of his creditors' to 'protect and to conserve property in his possession for the benefit of his creditors,' and to refrain [] from acting in a manner which could damage the estate[.]") (citing *In re Sharon Steel Corp.*, 86 B.R. 455, 457 (Bankr. W.D. Pa. 1988), *aff'd*, 871 F.2d 1217 (3d Cir. 1989)); *Stalford v. Blue Mack Transp. (In re Lands End Leasing)*, 193 B.R. 426, 435 (Bankr. D. N.J. 1996) ("it cannot be denied

13

4931-1941-7022 v1

that a breach of a fiduciary duty by an officer of a debtor-in-possession directly impacts on the debtor's ability to reorganize and pay creditors, thus implicating the court's core jurisdiction over matters clearly affecting the estate.").

50.    Consequently, among the fiduciary duties of Debtors and Sciamanna is the primary goal of getting "creditors paid" as part of the bankruptcy process." *In re Ionosphere Clubs*, 113 B.R., at 169 (quoting *In re Pied Piper Casuals, Inc.*, 40 B.R. 723, 727 (Bankr. S.D.N.Y. 1984)).

51.    Stated differently, "[i]n exchange for the authority to continue to manage the business affairs of a company, a debtor-in-possession owes fiduciary duties to its creditors and the estate.  These include the duty of care to safeguard estate assets, the duty of loyalty and the duty of impartiality." *Mfrs. & Traders Trust Co. v. Morningstar Marketplace, Ltd. (In re Morningstar Marketplace, Ltd.)*, 544 B.R. 297, 303 (Bankr. M.D. Pa. 2016).

52.    To fulfill the above fiduciary duty, the Debtors and Sciamanna are required to "avoid self-dealing, conflicts of interest and the appearance of impropriety." *In re Bowman*, 181 B.R. 836, 843 (Bankr. D. Md. 1995).

53.    If this Court finds that the Debtors and/or Sciamanna are incapable of performing their fiduciary duties, or if this Court recognizes that creditors' confidence in management evaporates, as it has with Firstrust's confidence in Debtors, a Chapter 11 Trustee must be appointed.  *In re McCorhill Publ'g Inc.*, 73 B.R. 1013, 1017 (Bankr. S.D.N.Y. 1987); *In re Marvel Entm't Grp.*, 140 F.3d 463, 473 (3d Cir. 1998).

54.    As explained fully below, the appointment of a Chapter 11 Trustee is warranted under these facts pursuant to either Bankruptcy Code section 1104(a)(1) or 1104(a)(2).

**B.  There Is Ample "Cause" To Warrant a Chapter 11 Trustee Appointment Under 11 U.S.C. § 1104(a)(1)**

55.    While section 1104(a)(1) of the Bankruptcy Code expressly identifies four bases

14

4931-1941-7022 v1

upon which "cause" may be found – fraud, dishonesty, incompetence, and gross mismanagement (all of which are present here) – those enumerated grounds are not exclusive; additional grounds may be determined on a case-by-case basis. *In re Marvel Entertainment Group*, 140 F.3d 463, 472 (3d Cir. 1998).

56.     Cause may also be established by the (1) materiality of the misconduct of the debtors' management, (2) even handedness or lack of the same in dealings with insiders or affiliated entities vis-à-vis other creditors, (3) the existence of prepetition voidable preferences or transfers, (4) unwillingness or inability of management to pursue estate causes of action, (5) conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties to the debtor, and (6) self-dealing by management or waste or squandering of corporate assets. *Id*.

57.     Here, all of the four enumerated, and several unenumerated recognized by case law, factors under 1104(a)(1) are implicated by Debtors' and Sciamanna's conduct such that appointment of a Chapter 11 Trustee is warranted.

58.     First, the Debtors and Sciamanna have been credibility accused of fraud.

59.     As a first example, former medical professional employees of Debtors and Sciamanna have alleged in court filings that Sciamanna stole Debtors' employees' credentials to fraudulently self-prescribe weight loss medication to himself and family members.  Ex. G.

60.     Thus, not only are the Debtors engaging in fraud and dishonesty, the manager Sciamanna is engaging in self-dealing and squandering corporate assets by essentially embezzling the Debtors' inventory for self-use through forgery thereby depleting the value of Firstrust's priority secured claim against all of Debtors' assets.

61.     Sciamanna further wasted the Debtors' assets by firing the employees of the Debtors who complained, rightfully so, that their credentials were being misused.  Ex. G.

15

62.     Second, the Debtors and Sciamanna have been credibly accused of gross mismanagement and incompetence that directly impacts the Debtors' ability to function as a medical service provider.

63.     For instance, in the Schimpf Lawsuit, a business partner of Sciamanna has alleged in a publicly filed lawsuit that after Debtors acquired Mr. Schimpf's business – which resulted in the formation of GVO Sweetgrass – Sciamanna misrepresented the Debtors' finances and grossly mismanaged the Debtors including the newly formed GVO Sweetgrass.

64.     Specifically, among other mismanagement, Sciamanna fired Schimpf in late 2025 in response to Schimpf's concerns about the toxic work environment that Sciamanna was creating at the Debtors, which resulted in a separate EEOC complaint unrelated to Sciamanna's termination of Schimpf, and other illegal activity. *See* Ex. H at 1-5.

65.     As further examples of illegal activity and mismanagement, Sciamanna is alleged to have tried to pressure Schimpf to transfer his interest in Schimpf's own private practice to another entity or surgeon in violation of South Carolina law. *Id*. at 5.

66.     The above demonstrates that Debtors under Sciamanna's control are being grossly mismanaged to the point of illegality, with the additional negative side-effect of Sciamanna terminating the Debtors' most valuable professional employees who try prevent this mismanagement.

67.     Through this conduct, Sciamanna has proven that he places his and his family's, i.e., insiders, interests above those of both creditors and other stakeholders of the Debtors' estate, further warranting appointment of a Chapter 11 Trustee.

68.     Third, the Debtors and Sciamanna engaged in voidable transfers by entering into seven MCA Loans, including as late as May 27, 2026, less than a month before Debtors filed for

16

4931-1941-7022 v1

Chapter 11 relief on June 16, 2026.  Exs. G, L.

69.     Several Bankruptcy Courts have found that MCA Loans are often voidable on the basis of their being usurious loans.  *See*, *e.g.*, *Sommers v. Glob. Merch. Cash, Inc. (In re Anadrill Directional Servs.)*, 676 B.R. 860, 873-74 (Bankr. S.D. Tx. 2026); *In re Williams Land Clearing, Grading, & Timber Logging, LLC*, 2025 Bankr. LEXIS 1201, at *25-28 (Bankr. E.D.N.C. May 16, 2025).

70.     Assuming *arguendo* that the MCA Loans are not usurious, they would still constitute voidable transfers by the Debtors and Sciamanna because the MCA Loans were not for fair consideration under Section 548(a)(1)(B) given that each MCA Loan required Debtors to quickly – within days of execution – repay the principle with significant excessive interest such that Debtors were left worse off financially than had they never entered into the MCA Loans.

71.     Indeed, the very timing of the MCA Loans being entered into the months immediately prior to Debtors seeking this Chapter 11 relief underscores that they did not provide fair consideration as they expedited the insolvency and financial liquidity crisis of the Debtors.

72.     Fourth, as evidenced by the Debtors' and Sciamanna's propensity to terminate employees who try to prevent Sciamanna from illegal activity and self-dealing, Sciamanna has shown a serious conflict of interest in that he places his interests, often personal at the expense of the Debtors' assets such as the self-prescribing medicine by forging employee credentials, between himself and the legitimate interests of the Debtors' estate and the creditors.

73.     These facts establish that the Debtors and Sciamanna are unable to serve as estate fiduciaries and mandate the immediate appointment of a Chapter 11 Trustee. *In re Euro-American Lodging Corp.*, 365 B.R. 421, 426 (Bankr. S.D.N.Y 2007) ("Dishonesty provides a reason to appoint a chapter 11 trustee under § 1104(a)(1)."); *Okla. Refinancing Co. v. Blaik (In re Okla.*

4931-1941-7022 v1

*Refinancing Co.)*, 838 F.2d 1133, 1136 (10th Cir. 1988); *In re V. Savino Oil*, 99 B.R., at 525.

74.     Further, in violation of the Conditional Resignation for GVO Partners in connection with the Stillwater Loan, and in violation of the Amended LLC Agreement of GVO Partners, *see* Exs. D & E, Debtors and Sciamanna have failed to take any actions to insert any independence into the management of the Debtors' business to property carry out their fiduciary duties for the benefit of the Debtors' estate, even though the Debtors agreed to do so in the interim cash collateral order.

75.     Firstrust must also point out that the first day filings made according to counsel, were not necessary and filed out of an abundance of caution.  For the critical vendor motion, the Debtors never provided any indication that supplies were being cut off, that there was an insufficient supply of medications, or that the medication could not be obtained from another source.  The Debtors never submitted the Critical Vendor order.  The Debtors then unilaterally cancelled the continued interim cash collateral hearing, and so the Debtors have not been able to use cash, by its own decision, since July 12, 2026.

76.     Finally, though the Debtors' attorneys initially consented to Firstrust to set up meetings with parties potentially interested in purchasing the Debtors' businesses, Debtors' counsel eventually asked to be taken off all communications with the interested parties and indicated that the Debtors would no longer participate in meetings with the parties expressing interest in acquiring the Debtors' businesses or assets.  Unwilling to take that chance, the meetings with interested parties were cancelled and a meaningful opportunity to find a purchaser or purchasers was stymied.  Fortunately, and notwithstanding the Debtors' efforts to derail the interest parties, these parties continue to express interest in the assets.  *See* emails between counsel for Debtors, Firstrust and potential purchasers attached hereto as Exhibits "M", "N", and "O."

77.     The above are independent and themselves sufficient basis for appointing a Chapter 11 Trustee. *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985) ("[T]he willingness of courts to leave debtors in possession 'is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee"); *In re William H. Vaugh & Co.*, 40 B.R. 524, 526 (Bankr. E.D. Pa. 1984) (holding that the appointment of a trustee was necessary because the debtor could not be trusted to scrutinize dealings between debtor and debtor's president).

78.     At bottom, it is apparent that cause exists to appoint a Chapter 11 Trustee under the standard set forth in Section 1104(a)(1).

## C.  Appointment of a Chapter 11 Trustee Is Warranted Under 11 U.S.C. §1104(a)(2)

79.     "With respect to whether a trustee should be appointed under Code § 1104(a)(2), courts 'eschew rigid absolutes and look to the practical realities and necessities.  Among the factors considered are: (i) the trustworthiness of the debtor; (ii) the debtor in possession's past and present performance and prospects for the debtor's rehabilitation; (iii) the confidence – or lack thereof – of the business community and of creditors in present management; and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment." *In re Ionosphere*, 113 B.R. at 168.

80.     Here, all four of these non-exhaustive factors weigh in favor of appointing a Chapter 11 Trustee.

81.     First, the trustworthiness of the Debtors and their controlling manager Sciamanna have is in serious question.  While conversion would remove him from control, it will also likely result in the immediate cessation of the Debtors' operations.  This does not serve the interests of creditors.

4931-1941-7022 v1

82.    Sciamanna's decision to place his own personal interests ahead of the interests of the Debtors' estates and their respective creditors through self-dealing as detailed above, warrants appointment of a Chapter 11 Trustee.  *In re Vascular Access Ctr., L.P.*, 611 B.R. 742, 745 (Bankr. E.D. Pa. 2020) (appointing chapter 11 trustee where debtors' manager "consistently put his own interest ahead of [the debtor]").

83.    Third, Firstrust and other creditors have no confidence in the Debtors' and/or Sciamanna's management of the Debtors' business, and though it does not question the Delaware Chapter 7 trustee panel, closing the Debtors' operations will immediately prejudice all creditors.

84.    At bottom, Debtors, through Sciamanna's mismanagement, have demonstrated that the benefits of appointing a Chapter 11 Trustee in this matter far outweigh the costs and that such relief is necessary to fulfill the purpose of 11 U.S.C. § 1104(a)(2).  See *In re Wings Digital Com.*, 2005 Bankr. LEXIS 3476, at *14 (Bankr. S.D.N.Y. May 16, 2025) (ruling that section 1104(a)(2) is a "lesser standard" than section 1104(a)(1)).

[*Remainder of this page intentionally left blank.*]

4931-1941-7022 v1

## RESERVATION OF RIGHTS

85.     Firstrust expressly reserves the right to supplement or amend this Motion and relief requested herein.  Accordingly, this Motion is without prejudice to Firstrust's rights to further assert any other facts or issues in support of the Motion.

                           Respectfully submitted,

Dated: July 17, 2026        BY:  */s/ Leslie B. Spoltore*
                                     Leslie B. Spoltore, Esquire
                                     Edmond M. George, Esquire (admitted *pro hac vice*)
                                     Michael D. Vagnoni, Esquire (admitted *pro hac vice*)
                                     **OBERMAYER REBMANN MAXWELL & HIPPEL LLP**
                                     123 S. Justison Street, Suite 100
                                     Wilmington, DE 19801
                                     Telephone – (302) 238-6947
                                     E-mail: leslie.spoltore@obermayer.com
                                             edmond.george@obermayer.com
                                             michael.vagnoni@obermayer.com
                                     *Counsel to Firstrust Bank*

21